**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

MERCEDES ROURKE-RODRIGUEZ, *et al.*,

Plaintiffs,

-v-

8:25-CV-738 (AJB/DJS)

UNITED STATES DEPARTMENT OF EDUCATION, *et al.*,

Defendants.

**Hon. Anthony Brindisi, U.S. District Judge:**

**DECISION and ORDER**

## I. INTRODUCTION

On June 10, 2025, plaintiffs Mercedes Rourke-Rodriguez ("Rourke-Rodriguez") and Ariwiio Swamp ("Swamp") filed this Administrative Procedure Act (the "APA") action against the Department of Education (the "Department") and Linda McMahon, in her official capacity as Secretary of the Department (collectively "defendants"). Dkt. No. 1.

Plaintiffs' initial complaint alleged that defendants violated the APA by implementing a new policy that unlawfully required American Indian students born in Canada to submit documentation of their immigration status from the Immigration and Naturalization Service (the "INS") as a precondition to receiving federal student aid under Title IV of the Higher Education Act. Dkt. No. 1 ¶¶ 1–6. Along with their complaint, plaintiffs sought emergency relief from enforcement of the new policy. Dkt. No. 2.

On June 11, 2025, the Court declined to issue a temporary restraining order but ordered expedited briefing on plaintiffs' request for a preliminary injunction. Dkt. No. 5. Defendants opposed plaintiffs' motion for injunctive relief and cross-moved to dismiss the action for lack of

subject matter jurisdiction pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1). Dkt. No. 12. Then, plaintiffs moved for leave to amend their complaint to add a proposed new plaintiff, Jayla Thompson ("Thompson"). Dkt. No. 16.

On October 21, 2025, the Court granted defendants' motion to dismiss for lack of subject matter jurisdiction and denied plaintiffs' motions as moot. Dkt. No. 22. Additionally, the Court *sua sponte* granted plaintiffs thirty days' leave to amend their complaint to remedy the deficiencies in their jurisdictional allegations. *Id.* Thereafter, plaintiffs timely filed an amended complaint, asserting substantially the same claims against defendants and naming Rourke-Rodriguez, Swamp, and Thompson as plaintiffs. Dkt. No. 25.

On February 4, 2026, plaintiffs moved under Rule 56 for summary judgment on their APA claims against defendants. Dkt. No. 34. Defendants opposed and cross-moved for summary judgment on plaintiffs' claims. Dkt. No. 36. Having been fully briefed, Dkt. Nos. 35,[1] 37–43, the Court decides the parties' cross-motions on the basis of the submissions without oral argument.

## II. BACKGROUND

### A. The Jay Treaty

Plaintiffs Rourke-Rodriguez, Swamp, and Thompson are American Indians who were born in Canada. Dkt. No. 38 ("Pls.' SMF") ¶ 1. They belong to the federally recognized Saint Regis Mohawk Tribe (the "Tribe") and have "at least 50% Native American blood." *Id.*

Under Article III of the Jay Treaty of 1794, American Indians born in Canada have a right to freely cross the United States-Canada border. *See* Treaty of Amity, Commerce and Navigation

[1] Pursuant to Local Rule 7.2, the Mohawk Council of Akwesasne (the "MCA") moved for leave file an *amicus curiae* brief in support of plaintiffs' motion. Dkt. No. 35. Plaintiffs consented, and defendants have not opposed. Dkt. No. 35-1 at 1. "[D]istrict courts have broad discretion to permit or deny an appearance as amicus curiae in a case." *United States v. Adams*, 348 F.R.D. 408, 409 (S.D.N.Y. 2025) (internal quotation omitted); *United States v. New York*, 814 F. Supp. 3d 266, 271 n.1 (N.D.N.Y. 2025) (granting unopposed motion for leave to file *amicus* brief). The Court grants the MCA's unopposed motion, and the MCA's brief, *see* Dkt. No. 35-2, is accepted for filing by the clerk of the Court.

("Jay Treaty"), art. 3, Gr. Brit.-U.S., Nov. 19, 1794, 8 Stat. 118. This right to travel was codified in § 289 of the Immigration and Nationality Act (the "INA") which exempts American Indians born in Canada who have at least 50 percent American Indian blood from standard immigration restrictions. 8 U.S.C. § 1359. Federal regulations adopted pursuant to the INA provide that these individuals "shall be regarded as having been lawfully admitted for permanent residence." 8 C.F.R. § 289.2.

Put differently, American Indians born in Canada with at least 50-percent American Indian blood need not apply for documentation (*i.e.*, a "Green Card") to establish lawful permanent residence in the United States; they are deemed permanent residents by law.

**B. Federal Student Aid**

As lawful permanent residents, American Indians born in Canada who attend college ("Jay Treaty students") may be eligible to receive federal student aid under the Higher Education Act (the "HEA"). *See* 20 U.S.C. § 1091(a)(5) ("[T]o receive any grant, loan, or work assistance under this subchapter, a student must . . . be a citizen or national of the United States, *a permanent resident of the United States*, or able to provide evidence from the Immigration and Naturalization Service that he or she is in the United States for other than a temporary purpose with the intention of becoming a citizen or permanent resident") (emphasis added).

But before an eligible student can receive federal student aid for a given award year, the student must submit a Free Application for Federal Student Aid ("FAFSA"). 20 U.S.C. § 1090. Ahead of each award year, the Department publishes a Federal Student Aid Handbook (the "FSA Handbook"). Dkt. No. 36-2 ("Defs.' SMF") ¶ 2. The FSA Handbook is "an annual publication intended for institutions of higher education, including financial aid administrators and counselors who assist students with the financial aid process, verify information, make corrections, and make other changes to the [i]nformation that a student reports on the[ir] [FAFSA]." *Id.* "Annual FSA

Handbooks include detailed guidance in multiple volumes and chapters, including a volume devoted to guidance on student eligibility." *Id.* ¶ 3.

The Department updates the FSA Handbook annually "after review by the Department's [Federal Student Aid] Office and the Office of Postsecondary Education." Defs.' SMF ¶ 7. The Department's annual review process "includes inter-agency review by certain agencies that provide information to institutions of higher education regarding individuals applying for federal student aid, including the Department of Homeland Security ([the] 'DHS'), the Internal Revenue Service, and the Department of Veterans Affairs." *Id.* ¶ 8.

In addition to the FSA Handbook, the Department publishes guidance throughout the year "in the form of Dear Colleague Letters . . . and Electronic Announcements ('E[A]s')." Defs.' SMF ¶ 5. Dear Colleague Letters and EAs ordinarily contain "system updates and technical guidance to [assist] institutions of higher education and their financial aid administrators in administering Title IV federal student aid funding and making" student eligibility determinations. *Id.* ¶ 5. In addition to regulations, Dear Colleague Letters and EAs serve as the "primary vehicles for the Department to provide policy guidance to the community." *Id.* ¶ 6.

**C. The Jay Treaty Student Policy Change**

Consistent with longstanding policy, the 2023–2024 FSA Handbook stated that Jay Treaty students were "not required to obtain documentation from the DHS" to apply for and receive federal student aid because "[s]uch individuals . . . are considered lawfully admitted for permanent residence." Dkt. No. 33-2 ("Admin. R.") at 89. Instead, Jay Treaty students could demonstrate their eligibility for the 2023–2024 award year by providing their social security number and one of the following forms of documentation: (1) a "band card" issued by the Band Council of a Canadian Reserve or by the Department of Indian Affairs in Ottawa, Canada; (2) birth or baptism records; (3) "an affidavit from a tribal official "or other person knowledgeable about the

applicant's . . . family"; or (4) identification "from a recognized Native American provincial or territorial organization." *Id.*

During the Department's annual review of the FSA Handbook ahead of the 2024–2025 award year, the DHS offered feedback "regarding information contained in the 'Jay Treaty' section." Defs.' SMF ¶ 9. Specifically, the DHS advised the Department to replace the acceptable forms of documentation identified in the 2023–2024 FSA Handbook with forms of documentation that can be obtained from the DHS or its subdivisions: (1) a Form I-551 PRC (*i.e.*, a Green Card) with the code S13; (2) an unexpired temporary I-551 stamp with the code S13 in a Canadian passport; or (3) an unexpired temporary I-551 stamp with the code S13 on an I-94. *See* Admin. R. at 75–76.

On February 28, 2024, the Department adopted the DHS's proposed changes and published the updated documentation requirement (the "new documentation requirement") as part of its 2024–2025 FSA Handbook. Admin. R. at 53–54. The Department neither acknowledged nor explained its change in policy in the 2024–2025 FSA Handbook or through any other form of guidance at that time. *Id.*

As set forth in the 2024–2025 FSA Handbook, the new documentation requirement instructed educational institutions to obtain proof that "[United States Citizenship and Immigration Services] or [Customs and Border Patrol] ha[d] determined that [a] student" is an American Indian born in Canada as defined by § 289 of the INA. Admin. R. at 54. The guidance further explained that Jay Treaty students "are likely to have a Form I-551 PRC with the code S13, an unexpired temporary I-551 stamp with the code S13 in a Canadian passport, or an unexpired temporary I-551 stamp with the code S13 on an I-94." *Id.*

Just over a week after the new documentation requirement was published, a representative from an educational institution contacted the Department for clarification as to whether Jay Treaty students could still use the forms of documentation listed in the 2023–2024 FSA Handbook to establish their eligibility. Admin. R. at 11–12. After consulting the DHS, *see* Admin. R. at 6–8, the Department responded that:

> All students should try and obtain the documentation outlined in the 2024–25 FSA Handbook, even if the student is returning. A new student applying for aid at your school for the 2024–25 award year can no longer utilize documents from the 2023–24 Handbook to establish eligibility.

*Id.* at 10–11. The Department further advised that it would provide guidance on a case-by-case basis "if a student was eligible in a previous award year (before 2024–25) based on documents submitted from the 2023–24 FSA Handbook (or prior)." *Id.* at 11.

Throughout 2024, the Department continued to receive and respond to inquiries from school representatives regarding the new documentation requirement. Admin. R. at 13–39. The Department advised one institution's financial aid representative that a student could still utilize the documentation listed in its former policy to establish eligibility. *Id.* at 14–15. Thereafter, the Department advised other university representatives that only Jay Treaty students who received aid in the 2023–2024 award year or earlier could continue to rely on the documentation allowed under the former policy. *Id.* at 17–25, 30–31, 33–36, 38–39.

On January 15, 2025, the Department issued an EA clarifying the new documentation requirement and its scope (the "January 15, 2025, EA"):

> After consultation with the Department of Homeland Security (DHS) about acceptable documentation for confirming the Title IV eligibility of American Indians born in Canada (formerly Jay Treaty students), FSA updated the acceptable documentation in the 2024-25 FSA Handbook. This electronic announcement outlines changes made to the acceptable documentation for American Indians born in Canada. . .

> If an American Indian born in Canada claiming *Title IV* eligibility under the Jay Treaty **received Title *IV* aid in** the 2023-24 award year **(or any prior award year),** then the institution may elect under 34 CFR 668.133(b) to not require such a student to submit additional immigration documentation to establish their title IV eligibility where the documents used to establish that eligibility have not expired, and where the institution does not have reason to believe that the student's claim of citizenship or immigration status is incorrect.
>
> If an American Indian born in Canada claiming *Title IV* eligibility under the Jay Treaty **did not previously receive** *Title IV* aid in the 2023–24 award year (or any prior award year) and is seeking to establish their status as an eligible noncitizen for the 2024–25 award year or later, then the student may submit any of the following immigration documentation to establish *Title IV* eligibility:
>
> - Form I-551 PRC with the code S13;
> - An unexpired temporary I-551 stamp with the code S13 in a Canadian passport; **or**
> - An unexpired temporary I-551 stamp with the code S13 on an I-94

Admin R. at 3 (emphases in original). The new documentation requirement contained in the 2025–2026 FSA Handbook is consistent with the January 15, 2025, EA. Dkt. No. 34-5 at 14.

**D. Impact on Plaintiffs**

**1. Rourke-Rodriguez**

Rourke-Rodriguez is a college student at SUNY Canton. Pls.' SMF ¶ 2. During the 2024–2025 school year, she applied for and received federal student aid. *Id.* For reasons not entirely clear from the record, SUNY Canton allowed Rourke-Rodriguez to demonstrate her eligibility for the 2024–2025 award year using a tribal letter—a form of documentation acceptable under the Department's former policy. *Id.*

Ahead of the 2025–2026 school year, Rourke-Rodriguez again sought federal student aid. Pls.' SMF ¶ 3. In July 2025, she contacted SUNY Canton regarding the status of her FAFSA. *Id.* She was advised that her application had not been processed due to the new documentation requirement, and that she would need to obtain a Green Card to demonstrate her federal student aid

eligibility for the 2025–2026 award year. *Id.* Because Rourke-Rodriguez's father is a United States citizen, she "responded by applying for a U.S. passport in order to establish her eligibility for federal student aid as a citizen rather than as a Jay Treaty student." *Id.* ¶ 4. "However, that process has not yet been completed after several rounds of correspondence with the passport authorities." *Id.*

In the meantime, Rourke-Rodriguez "has received no federal student aid for the 2025–2026 school year." Pls.' SMF ¶ 5. Consequently, she took only "one online course at SUNY Canton during the fall semester and again [in the] spring semester since her family has been forced to cover the cost." *Id.* "Had she received federal student aid as she did during her freshman year, she would be taking a full course load and living on-campus." *Id.*

**2. Swamp**

"Swamp was accepted at SUNY Canton for the 2024–2025 school year and planned to attend." Pls.' SMF ¶ 6. "He applied for and received an award of federal student aid after documenting his status as a Jay Treaty student by providing documents from the Tribe." *Id.* Swamp did not end up using the aid awarded to him for the 2024–2025 school year because he deferred his enrollment until the 2025–2026 school year. *Id.* ¶ 7.

"In the spring of 2025, . . . Swamp contacted the Tribe about submitting a FAFSA for [the] 2025–2026 [award year]." Pls.' SMF ¶ 8. He "was advised of the Department's new policy for Jay Treaty students, which would require him to obtain documentation from the U.S. Department of Homeland Security." *Id.* "Swamp is unwilling as a matter of principle to comply with this new requirement which he believes is unlawful." *Id.* ¶ 9. "Consequently, [he] is not attending college at present." *Id.* ¶ 10. "He would like to attend college but cannot afford to do so without federal student aid." *Id.*

**3. Thompson**

Thompson is a student at SUNY Potsdam. Pls.' SMF ¶ 11. "She applied for and received federal student aid for her freshman year there (2024–2025) after establishing her eligibility as a Jay Treaty student by producing a tribal letter." *Id.* "When . . . Thompson went to prepare a FAFSA for her sophomore year (2025–2026), her school guidance counselor advised her that she now needs a Green Card in order to submit a FAFSA." *Id.* ¶ 12. "She believes this requirement is unlawful and is unwilling as a matter of principle to apply for a Green Card." *Id.* "In order to pay for school . . . without federal student aid, . . . Thompson has utilized financial aid from the Tribe, private scholarships, and $3,000 in funds contributed by her mother and grandmother." *Id.*

## III. LEGAL STANDARD

### A. Rule 56

The entry of summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Cross-motions for summary judgment do not alter this standard, but simply require the court to determine whether either party is entitled to judgment as a matter of law on facts that are not in dispute. *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Terwilliger v. Terwilliger*, 206 F.3d 240, 244 (2d Cir. 2000)). "[A] district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

In the APA context, the "question of law" to be decided on summary judgment is often whether a challenged agency action is, "among other things, 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' or 'in excess of statutory jurisdiction, authority, or limitations.'" *Aleutian Cap. Partners, LLC v. Scalia*, 975 F.3d 220, 229 (2d Cir. 2020) (quoting 5 U.S.C. § 706(2)(A), (C)). "Section 706 of the APA authorizes courts to review *de novo*

'all relevant questions of law' and 'interpret[ations] [of] constitutional and statutory provisions' made by an agency." *Aleutian Cap. Partners*, 975 F.3d at 229 (quoting 5 U.S.C. § 706). Where the reviewing court finds for the challenger, it must "hold unlawful and set aside" the challenged agency action. 5 U.S.C. § 706 (2).

## IV. DISCUSSION

Plaintiffs have moved for summary judgment on their APA claims, arguing that defendants' new documentation policy is substantively and procedurally defective. Dkt. No. 34-6 ("Pls.' Mem.") at 18–27. Defendants opposed plaintiffs' motion and cross-moved for summary judgment, arguing that plaintiffs lack standing to challenge the new documentation policy and, regardless, that the new documentation requirement was issued in accordance with required regulatory procedures and is compliant with controlling law. Dkt. No. 36-1 ("Defs.' Opp.") at 11–35.

### A. Standing

Before addressing plaintiffs' APA claims, the Court considers defendants' standing argument. *See All. For Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 85 (2d Cir. 2006) ("[A] district court must generally resolve material factual disputes and establish that it has federal constitutional jurisdiction, including a determination that the plaintiff has Article III standing, before deciding a case on the merits.").

Defendants argue that they are entitled to summary judgment on plaintiffs' claims, in part, because plaintiffs have not established that they have standing to challenge the Department's new documentation requirement. Defs.' Opp. at 10–19. In opposition, plaintiffs maintain that they have standing because "it is undisputed that plaintiffs are Jay Treaty students . . . subject to the Department's new policy." Dkt. No. 37 ("Pls.' Reply") at 9.

To establish Article III standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the

defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *F.D.A. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). "'Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements." *Id.* at 382. "So in those cases, standing is usually easy to establish." *Id.*

As an initial matter, the Department's new documentation requirement applies to plaintiffs and requires them to obtain documentation from the INS to demonstrate their eligibility for federal student aid. Per the Department's January 15, 2025, EA, the new documentation requirement applies to Jay Treaty students who "did not previously receive Title IV aid in the 2023–24 award year (or any prior award year) and [are] seeking to establish their status as an eligible noncitizen for the 2024–25 award year or later." Admin. R. at 3. The undisputed record evidence establishes that: (1) plaintiffs are Jay Treaty students, Defs.' Resp. SMF ¶¶ 1–2, 6, 11; (2) plaintiffs did not receive aid in the 2023–2024 award year or earlier, *cf. id.* ¶¶ 2, 6, 11 (stating that plaintiffs were first awarded aid in the 2024–2025 award year); and (3) plaintiffs have sought to establish their eligibility for the 2024–2025 award year or later, *id.* ¶¶ 3, 8, 12.

Nevertheless, defendants argue that plaintiffs lack standing because it was their own voluntary non-compliance with the new documentation requirement that prohibited them from receiving aid, not the new documentation requirement itself. Defs.' Opp. 12–17. In opposition, plaintiffs maintain that they are not required to comply with a regulatory framework that they believe is unlawful in order to establish standing to challenge it. Pl.'s Reply at 10–12.

Defendants' argument must be rejected. "To be sure, a plaintiff may not establish injury for standing purposes based on a 'self-inflicted' injury." *Nat. Res. Def. Council, Inc. v. U.S. F.D.A.*, 710 F.3d 71, 85 (2d Cir. 2013), *as amended* (Mar. 21, 2013). But "[a]n injury is 'self-inflicted' so as to defeat standing only if 'the injury is so completely due to the plaintiff's own

fault as to break the causal chain.'" *Backer ex rel. Freedman v. Shah*, 788 F.3d 341, 344 (2d Cir. 2015) (quoting *St. Pierre v. Dyer,* 208 F.3d 394, 402 (2d Cir. 2000)). And as the Supreme Court "has made clear[,] . . . an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 290 (2022). In other words, "[s]o long as the defendants have engaged in conduct that may have contributed to causing the injury, it would be better to recognize standing." *St. Pierre*, 208 F.3d at 402.

The undisputed factual record reflects that plaintiffs have been deemed eligible to receive federal student aid under the former documentation policy, *see* Defs.' Resp. SMF ¶¶ 2, 6, 11, but have not received aid under the new documentation requirement, *id.* ¶¶ 5, 10, 13. Accordingly, a reasonable factfinder could conclude from the available record that the new documentation requirement contributed to plaintiffs' claimed injuries. Consequently, plaintiffs' refusal to comply with the Department's allegedly unlawful requirement has not defeated their standing to challenge it.

Alternatively, defendants argue that plaintiffs' injuries are attributable to plaintiffs' universities rather than the new documentation requirement because, under the January 15, 2025, EA, plaintiffs' universities could have granted plaintiffs an exemption from the new documentation requirement. Defs.' Mem. at 17–18. In opposition, plaintiffs argue that "the Department cannot absolve itself from responsibility for plaintiffs' injuries by pointing its finger at the schools that administer the exemption process it created." Pl.'s Reply at 12.

Defendants' alternative argument fails for two reasons. First off, contrary to defendants' contentions, plaintiffs are not entitled to an exemption from the new documentation requirement

under the January 15, 2025, EA. Although *some* past aid recipients qualify for an exemption from the new documentation requirement under the January 15, 2025, EA, plaintiffs do not. *Contrast* Admin. R. at 3 (authorizing exemption for students who received aid in the 2023–2024 award year or prior), *with* Defs.' Resp. SMF ¶¶ 2, 6, 11 (stating that plaintiffs were first awarded aid in the 2024–2025 award year). For reasons not entirely clear from the record, plaintiffs were awarded federal student aid for the 2024–2025 school year without having to comply with the new documentation requirement. Pls.' SMF ¶¶ 2, 6, 11. But as the January 15, 2025, EA explains:

> If an American Indian born in Canada claiming Title IV eligibility under the Jay Treaty received Title IV aid *in the 2023-24 award year (or any prior award year)*, then the institution may elect under 34 CFR 668.133(b) to not require such a student to submit additional immigration documentation to establish their title IV eligibility where the documents used to establish that eligibility have not expired, and where the institution does not have reason to believe that the student's claim of citizenship or immigration status is incorrect.

Admin. R. 3 (emphasis added).

There is no evidence in the available record that plaintiffs received federal student aid in the 2023–2024 award year or prior. *See generally*, Pls.' SMF. Accordingly, plaintiffs' universities are not responsible for plaintiffs' alleged injuries because they were not authorized to grant plaintiffs an exemption from the new documentation requirement under the January 15, 2025, EA.

Moreover, even assuming that plaintiffs were eligible for an exemption from the new documentation requirement, the universities' alleged role in denying plaintiffs an exemption did not break the chain of causation between defendants' new documentation requirement and plaintiffs' injuries. *See Heldman ex rel. T.H. v. Sobol*, 962 F.2d 148, 156 (2d Cir. 1992) ("Although a third party not before the court . . . played a role in [plaintiff]'s alleged injury, [the third party]'s actions were the direct result of the regulations and do not constitute 'independent action.'").

In sum, a reasonable factfinder could conclude from the available record that plaintiffs have standing to challenge defendants' new documentation requirement. Accordingly, defendants' standing arguments must be rejected.

**B. APA Claims**

Plaintiffs argue that they are entitled to summary judgment on their APA claims because defendants' new documentation requirement is plagued by fatal procedural and substantive defects. Pls.' Mem. at 19–27. In opposition, defendants maintain that they issued the new documentation requirement in compliance with required procedures and in conformance with all applicable laws. Defs.' Opp. at 19–35.

**1. Arbitrary and Capricious**

Plaintiffs argue that the Court should set aside the new documentation requirement as arbitrary and capricious because defendants offered no explanation for departing from their longstanding policy that Jay Treaty students are not required to obtain proof of their eligibility from the DHS. Pls.' Mem. at 26–28. In opposition, defendants maintain that the new documentation requirement was "well-supported" by the Department's published rationale. Defs.' Opp. at 31–35.

The APA "instructs a reviewing court . . . to 'hold unlawful and set aside agency action, findings, and conclusions found to be [among other things] . . . arbitrary [or] capricious.'" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515, (2009) (quoting 5 U.S.C. § 706(1), (2)(A)). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. E.P.A.*, 603 U.S. 279, 292 (2024) (quoting *F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

When agency action departs from an agency's established practices, the "requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display

awareness that it *is* changing position." *Fox Television*, 556 U.S. at 515 (emphasis in original). "An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.* This principle is known as the "change-in-position" doctrine. *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568, (2025).

"The change-in-position doctrine asks two questions." *Wages & White Lion Invs.*, 604 U.S. at 569. "The first is whether an agency changed existing policy." *Id.* Then, "[o]nce a change in agency position is identified, the doctrine poses a second question: Did the agency 'display awareness that it *is* changing position' and offer 'good reasons for the new policy'?" *Id.* at 570 (quoting *Fox Television*, 556 U.S. at 515) (emphasis in original).

With respect to the first question, the Supreme Court has suggested that an agency changes its position when it: (1) "acts 'inconsistent[ly]' with an 'earlier position,'" *Wages & White Lion Invs.*, 604 U.S. at 569 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)); (2) "performs 'a reversal of [its] former views as to the proper course,'" *Wages & White Lion Invs.*, 604 U.S. at 569 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 41 (1983)); or (3) "'disavow[s]' prior 'inconsistent' agency action as 'no longer good law,'" *Wages & White Lion Invs.*, 604 U.S. at 569 (quoting *Fox Television*, 556 U.S. at 517).

The administrative record shows, and defendants concede, that the new documentation requirement amounted to a change in position. *See* Admin. R. at 3 (outlining "changes made to the acceptable documentation for American Indians born in Canada"), 6–8 (explaining that formerly acceptable documentation may no longer be accepted as evidence of eligibility); Dkt. No. 36-2 ("Defs.' SMF") (characterizing the new documentation requirement as "a change in the Department's previous interpretation" of applicable law).

Having determined that the Department changed its position, the Court proceeds to the second step of the "change-in-position" analysis. At the second step, the Court must ascertain whether the Department "'display[ed] awareness that it [was] changing position' and offer[ed] 'good reasons for the new policy.'" *Wages & White Lion Invs.*, 604 U.S. at 570 (quoting *Fox Television*, 556 U.S. at 515).

The Department maintains that "the facts and governing regulation," *i.e.*, 34 C.F.R. § 668.33, "rebut [p]laintiffs' claim that [d]efendants did not offer 'good reasons' for the Guidance." Defs.' Opp. at 32. Specifically, the Department contends that it "reviewed the DHS feedback with the relevant implementing regulations" and adopted the new documentation requirement in an effort to comply with 34 C.F.R. § 668.33. Defs.' Opp. at 31–32. Plaintiffs maintain that the Department's proffered explanation is conclusory and fails to sufficiently explain the Department's reasons for abandoning its longstanding policy. Pls.' Reply at 15.

"Deciding whether agency action was adequately explained requires, first, knowing where to look for the agency's explanation." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020). As the Supreme Court has explained, "reviewing courts remain bound by traditional administrative law principles, including the rule that judges generally must assess the lawfulness of an agency's action in light of the explanations the agency offered for it rather than any *ex post* rationales a court can devise." *Garland v. Ming Dai*, 593 U.S. 357, 369 (2021). Accordingly, the Court looks to the explanation the Department offered when it issued the new document requirement.

On February 28, 2024, the Department first published the new documentation requirement in its 2024–2025 FSA Handbook. Admin. R. at 53–54. At that time, the Department neither acknowledged nor explained the departure from its former policy. *Id.* As set forth in the 2024–2025 FSA Handbook, the new documentation requirement directed institutions to obtain proof

"that USCIS or CBP ha[d] determined that [a] student" was eligible for federal student aid. *Id.* at 54. The guidance further explained that Jay Treaty students would "likely . . . have a Form I-551 PRC with the code S13, an unexpired temporary I-551 stamp with the code S13 in a Canadian passport, or an unexpired temporary I-551 stamp with the code S13 on an I-94." *Id.*

Nearly a year later, the Department published the January 15, 2025, EA, elaborating on the new documentation requirement and its implementation. Admin. R. at 3. There, the Department offered the following explanation for its change in policy: "After consultation with the [DHS] about acceptable documentation for confirming the Title IV eligibility of American Indians born in Canada (formerly Jay Treaty students), FSA updated the acceptable documentation in the 2024–25 FSA Handbook." *Id.*

In other words, the Department implemented the new documentation requirement because the DHS said so. To be sure, an agency "does not need to show 'that the reasons for the new policy are *better* than the reasons for the old one.'" *Wages & White Lion Invs.*, 604 U.S. at 570 (quoting *Fox Television*, 556 U.S. at 515) (emphasis in original). Indeed, "'[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change,' 'display awareness that [they are] changing position,' and consider 'serious reliance interests.'" *Wages & White Lion Invs.*, 604 U.S. at 568 (quoting *Encino Motorcars*, 579 U.S. at 221–222) (internal quotation omitted).

In fairness, there is evidence in the administrative record that the Department considered the reliance interests of students who had previously received federal aid under the former policy. The January 15, 2025, EA permits an institution to exempt some past aid recipients from complying with the new documentation requirement. *See* Admin. R. at 3.

But taking reliance interests into account does not relieve the Department of its obligation to offer a reasoned explanation for changing its longstanding documentation policy. And upon review of the administrative record, the Department's proffered explanation for the new documentation requirement, *i.e.*, to conform its guidance to 34 C.F.R. § 668.33, does not adequately explain the Department's change in position.

To begin with, accepting the Department's proffered explanation would require the Court to disregard the "foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Regents of the Univ. of Cal.*, 591 U.S. at 20. Although it now claims that it was endeavoring to bring this policy into compliance with a federal regulation, The Department did not reference 34 C.F.R. § 668.33 in either published iteration of the new documentation requirement or in its responses to the inquiries it received regarding the new documentation requirement. *See* Admin. R. at 3 (January 15, 2025, EA), 10–39 (Department Responses), 53–54 (2024–2025 FSA Handbook).

And even assuming that the Department had contemporaneously cited 34 C.F.R. § 668.33 as its justification for the new documentation requirement, the Department still failed to articulate a reasoned explanation for changing its longstanding interpretation of 34 C.F.R. § 668.33. After all, 34 C.F.R. § 668.33 had been in effect at the time that the Department announced its prior documentation policy in 1998, *see* Pls.' Mem. at 19 (citing Fed. Reg. 45712, 45725 (Dec. 1, 1987)), and at that time, the Department made clear that Jay Treaty students "are not required to obtain documentation from the [INS] and are deemed 'lawfully admitted for permanent residence' and,

thus, eligible for Title IV student financial assistance." Dkt. No. 34-2 at 3.[2] The Department maintained that position until 2024, when it suddenly determined that compliance with 34 C.F.R. § 668.33 required Jay Treaty students to produce evidence of their eligibility from the INS. *Contrast* Admin. R. at 89 *with* Admin. R. at 53–54.

Put differently, the Department reversed course. And though an "agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate," *Fox Television Stations*, 556 U.S. at 515, "[s]ometimes it must—when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy," *id.*

"In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox Television Stations*, 556 U.S. at 515–16; *see also Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (explaining that an agency must "examine[ ] 'the relevant data' and articulate[ ] 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" (quoting *State Farm*, 463 U.S. at 43)). Consequently, an "[u]nexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motorcars*, 579 U.S. at 212.

---

[2] Plaintiffs have submitted evidence relevant to the new documentation requirement that does not appear in the Department's administrative record—namely, the Department's 1998 "Dear Colleague" letter announcing the Department's former documentation policy, *see* Dkt. No. 34-2, and the 2000–2001 FSA Handbook, *see* Dkt. No. 34-3.

"Generally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision." *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997). But courts "have delineated several circumstances in which a party may nevertheless include evidence beyond the scope of the designated administrative record." *Saget v. Trump*, 375 F. Supp. 3d 280, 341 (E.D.N.Y. 2019). For example, courts have considered supplemental evidence relevant to an agency action "to evaluate whether the agency failed to consider all relevant factors, ignored an important aspect of the problem, or deviated from established agency practices." *Id.* Because plaintiffs claim that the Department improperly deviated from a longstanding policy, the Court will consider plaintiffs' supplemental evidence to the extent that it reflects the Department's prior policy.

The Department failed to offer any explanation, reasoned or otherwise, for abandoning its longstanding position that, due to their unique legal status, Jay Treaty students are not required to produce documentation from the DHS to establish their eligibility for federal student aid. Given the unexplained inconsistency between the Department's new documentation requirement and its historical interpretation of applicable law, the Department's imposition of the new documentation requirement was arbitrary and capricious and must be set aside.

**2. Contrary to Law and In Excess of Statutory Authority**

Plaintiffs argue that, even if the Department's proffered rationale adequately explained its change in position, the new documentation requirement must nevertheless be set aside because it exceeds the Department's statutory authority to regulate federal student aid under the HEA, and it conflicts with the Immigration and Nationality Act. Pls.' Mem. at 18–23. In opposition, defendants maintain that the new documentation requirement conforms to the controlling statutory and regulatory frameworks and falls squarely within the Department's authority to adopt regulations ensuring that only eligible individuals receive federal student aid. Defs.' Opp. at 19–24.

"When interpreting a federal statute—including a statute that a defendant agency is charged with administering—[courts] must 'exercise independent judgment.'" *Bd. of Trs. of Bakery Drivers Loc. 550 & Indus. Pension Fund v. Pension Benefit Guar. Corp.*, 136 F.4th 26, 29 (2d Cir. 2025) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024)), *cert. denied sub nom. Pension Benefit Guar. Corp v. Bd. of Trs. Bakery Drivers*, No. 25-701, 2026 WL 1377108 (U.S. May 18, 2026).

The Department has identified Title IV of the HEA as the statutory source of its authority to adopt the new documentation requirement. Defs.' Opp. at 19–24. "Title IV of the [HEA] governs federally-funded student financial aid programs for college and post-secondary vocational

training." *Coal. of N.Y. State Career Schs., Inc. v. Riley*, 129 F.3d 276, 277 (2d Cir. 1997) (citing 20 U.S.C. §§ 1070–1099d). One stated purpose of the HEA is to provide financial aid to eligible students. 20 U.S.C. § 1070(a).

To that end, the HEA directs the Secretary of Education (the "Secretary") to develop and "make available . . . a free application to determine the eligibility of a student for Federal financial aid." 20 U.S.C. § 1090(a)(2)(A). Section 1090(a)(2)(B) of the HEA sets forth the categories of information that the Secretary must obtain to determine whether an applicant is eligible to receive federal student aid. *Id.* § 1090(a)(2)(B). Importantly, and as relevant here, "the Secretary may not require additional information to be submitted by an applicant . . . for Federal financial aid through other requirements or reporting, except as required" to authorize financial aid adjustments "under section 1087tt." *Id.* § 1090(a)(5).

Among the categories of information that the Secretary is authorized to obtain from an applicant is the applicant's citizenship status. 20 U.S.C. § 1090(a)(2)(B)(ii). Section 1091(a)(5) of the HEA sets out the citizenship-related criteria for federal student aid eligibility. To be eligible for federal student aid under § 1091(a)(5), an applicant must be:

> a citizen or national of the United States, a permanent resident of the United States, *or* able to provide evidence from the Immigration and Naturalization Service that he or she is in the United States for other than a temporary purpose with the intention of becoming a citizen or permanent resident.

20 U.S.C. § 1091(a)(5) (emphasis added).

By listing the eligible immigration statuses in the disjunctive, § 1091(a)(5) distinguishes lawful permanent residents (like plaintiffs) from the category of applicants who must be able to produce evidence from the INS regarding their intent to remain "in the United States for other than a temporary purpose with the intention of becoming a citizen or permanent resident."

Notwithstanding the plain language of § 1091(a)(5), the Department's new documentation requirement requires Jay Treaty students seeking federal student aid to provide evidence of their eligible citizenship status from the INS. Recall that, according to the Department, the new documentation requirement was necessary to conform its guidance to its own longstanding regulation—34 C.F.R. § 668.33—which states that:

> (a) Except as provided in paragraph (b) of this section, to be eligible to receive title IV, HEA program assistance, a student must—
> (1) Be a citizen or national of the United States; or
> (2) Provide evidence from the U.S. Immigration and Naturalization Service that he or she—
> (i) Is a permanent resident of the United States; or
> (ii) Is in the United States for other than a temporary purpose with the intention of becoming a citizen or permanent resident.

34 C.F.R. § 668.33; *see* Defs.' Opp. at 19–20.

Although 34 C.F.R. § 668.33 is purportedly authorized by § 1091 of the HEA, it directly conflicts with the text of § 1091(a)(5) by requiring lawful permanent residents to demonstrate their eligibility for federal student aid with evidence from the INS. *Contrast* 34 C.F.R. § 668.33, *with* 20 U.S.C. § 1091(a)(5).

The inconsistency between 34 C.F.R. § 668.33 and 20 U.S.C. § 1091 is likely attributable to subsequent amendments to § 1091. Indeed, the language of 34 C.F.R. § 668.33 most closely tracks subsection (c)(2) of an earlier version of § 1091. *See* Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 121, 100 Stat. 3359, 3360 (redesignated as § 1091(h)(2) in 1988). But the text of that subsection has since been removed. *See* Higher Education Amendments of 1992, Pub. L. No. 102-325, § 484, 106 Stat. 448, 616.

As it stands, 34 C.F.R. § 668.33 contravenes § 1091. And "[a] regulation which does not implement the will of Congress as expressed by the statute and instead operates to create a rule out

of harmony with the statute, is a mere nullity." *United States v. Kahn*, 5 F.4th 167, 176 (2d Cir. 2021) (finding that a subsequently enacted statute superseded an inconsistent regulation that tracked the language of a prior version of the statute) (internal quotation omitted); *see also Iglesias v. United States*, 848 F.2d 362, 367 (2d Cir. 1988) ("A regulation, however, may not serve to amend a statute . . . or to add to the statute something which is not there.") (internal quotations and citations omitted).

Because 34 C.F.R. § 668.33 creates a rule that is out of harmony with its authorizing statute, the Department cannot rely on it to justify the new documentation requirement. *See Iglesias*, 848 F.2d at 367 (finding regulation null where it altered the scope of exclusions listed in authorizing statutory provision).

To avoid this result, defendants attempt to justify the new documentation requirement by pointing out "that Congress expressly empowered the Secretary [of Education] to implement a verification system to confirm students' eligibility for aid based on immigration status for citizens and noncitizens alike." Defs.' Opp. at 21 (citing 20 U.S.C. § 1091(g)).

As defendants correctly point out, § 1091(g)(1) of the HEA directs the Secretary to implement a verification system "under which the statements and supporting documentation, *if required*, of an individual declaring that such individual is in compliance with the requirements of subsection (a)(5) shall be verified prior to the individual's receipt of a grant, loan, or work assistance under this subchapter." 20 U.S.C. § 1091(g)(1) (emphasis added); *see also* 20 U.S.C. § 1091(g)(3) (prescribing verification mechanisms).

But defendants seemingly ignore § 1091(g)(1)'s explicit acknowledgement that not all applicants are required to submit supporting documentation of their immigration status from the INS. And as explained *supra*, Jay Treaty students do not need to produce documentation of their

immigration status from the INS to be "in compliance with" § 1091(a)(5). Consequently, § 1091(g)(1) does not lend support to the new documentation requirement.[3]

That is not to say that defendants are without any mechanism to verify a Jay Treaty student's claim of eligibility. If the Secretary is unable to verify a Jay Treaty student's declaration of eligibility utilizing the verification mechanisms prescribed by § 1091(g)(3), then, pursuant to § 1091(g)(4), the student's "institution [ ] shall provide a reasonable opportunity to submit to the institution evidence indicating a satisfactory immigration status . . . and . . . if there are submitted documents which the institution determines constitute reasonable evidence indicating such status," then "the institution shall transmit" the evidence to the INS for verification. 20 U.S.C. § 1091(g)(4).

Critically though, § 1091(g)(4) unambiguously vests the authority to determine whether a student's submitted documentation constitutes reasonable evidence of an eligible immigration status in the student's institution, not defendants. 20 U.S.C. § 1091(g)(4). Defendants cannot circumvent § 1091(g)(4) by restricting an institution's ability to consider evidence not provided by the INS.

[3] The non-binding and circumstantially distinguishable case defendants cite does not alter the Court's conclusion. In *Alexander v. Trustees of Boston University*, student aid applicants challenged a regulation "requiring every aid applicant . . . to file a statement certifying 'either that he or she is registered with Selective Service or that, for a specified reason, he or she is not required to be registered.'" 766 F.2d 630, 632–33 (1st Cir. 1985) (quoting 34 C.F.R. § 668.24(a)(2)).

The authorizing statute at issue in *Alexander* required the Secretary to obtain statements of compliance from applicants required to register with the Selective Service, but was silent as to applicants who are not required to register. *See* 50 U.S.C. § 3811(f)(2). In that regard, the circumstances of this case are distinguishable. As relevant here, § 1091(g)(1) provides that an applicant's declaration of compliance with § 1091(a)(5) can be made through a statement or supporting documentation, *if required*. *See* § 1091(g)(1).

Though the challenged regulation in *Alexander* swept more broadly than its authorizing statute, it did not conflict with the terms of the statute. The new documentation requirement expressly conflicts with the authorizing statutory provisions by requiring documentation from applicants who need only provide a statement of compliance with § 1091(a)(5).

In sum, defendants exceeded their authority under the HEA by imposing a heightened documentation requirement on Jay Treaty students seeking to demonstrate their eligibility for federal student aid.[4]

**C. Remedy**

The APA "instructs reviewing courts to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Dep't of Com. v. New York*, 588 U.S. 752, 771 (2019) (quoting 5 U. S. C. § 706(2)(A)). For the reasons explained *supra*, defendants' imposition of the new documentation requirement was arbitrary and capricious and in excess of defendants' statutory authority under the HEA. Accordingly, it must be set aside.

## V. CONCLUSION

Therefore, it is

ORDERED that

1. The MCA's motion for leave to file an *amicus curiae* brief (Dkt. No. 35) is GRANTED;
2. Plaintiffs' motion for summary judgment (Dkt. No. 34) is GRANTED;
3. Defendants' cross-motion for summary judgment (Dkt. No. 36) is DENIED; and
4. Defendants' policy requiring Jay Treaty students to demonstrate their eligibility for federal student aid by providing evidence from the INS is VACATED.

The Clerk of the Court is directed to terminate the pending motions, enter a judgment accordingly, and close the file.

**IT IS SO ORDERED.**

Dated: September 1, 2026
Utica, New York.

Anthony J. Brindisi
U.S. District Judge

[4] In light of this conclusion, the Court need not reach plaintiffs' remaining argument, *i.e.*, that the new documentation requirement conflicts with the Immigration and Nationality Act, or defendants' nonbinding supplemental authority on that point. *See New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 64 (2d Cir. 2020) (declining to consider plaintiffs' additional argument after finding that plaintiffs were "likely to succeed on the merits of their two primary arguments").